BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
Assistant United States Attorney
Deputy Chief, Criminal Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1259/2429
     Facsimile: (213) 894-0141
     E-mail:    alexander.schwab@usdoj.gov
                nisha.chandran@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-19-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION REGARDING RESTITUTION; SUPPLEMENTAL DECLARATION OF RYAN ASATO |
| v. | |
| JAMES ARTHUR MCDONALD, JR., | Hearing Date: 10-20-2025 |
| Defendant. | Location:   Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Alexander B. Schwab and Nisha Chandran, hereby files its position regarding restitution pursuant to the Court's order dated September 2, 2025 (Dkt. 68).

This position regarding restitution is based upon the government's previously filed sentencing position, the files and records in this case, including the Revised Presentence Investigation

Report (Dkt. 55), and such further evidence and argument as the Court may permit.

Dated: September 22, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division

       /s/
ALEXANDER B. SCHWAB
NISHA CHANDRAN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  ARGUMENT........................................................2

     A.   Legal Standard.............................................2

     B.   No Procedural Bar Limits the Restitution To Which
          Defendant's Victims Are Entitled...........................2

     C.   The Court Should Award $3,255,072.13 in Restitution........5

          1.   Defendant's Challenges to the Victim Status of
               the Remaining ISA Victims Overlooks the Nature of
               Defendant's Fraud Scheme..............................6

          2.   Defendant Does Not Challenge the Loss Amount of
               the Majority of ISA Victims...........................7

          3.   Defendant's Limited Challenges to the Remaining
               ISA Victims are Incorrect.............................8

     D.   The Interpleader Action...................................10

III. CONCLUSION.....................................................10

iii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

As this Court knows, defendant was the Chief Executive Officer ("CEO"), Chief Investment Officer ("CIO"), and investment adviser representative of Hercules Investments LLC and the CEO and CIO of Index Strategy Advisors Inc. ("ISA").  Regarding Hercules, defendant pitched investment opportunities to potential investors and convinced victims to purchase units in Hercules, but concealed from investors that because of a risky bet that he had made using Hercules's clients' funds, Hercules's clients had recently lost between $30 million and $40 million; and that defendant had agreed on behalf of Hercules to repay Hercules's clients, including, if necessary, with funds obtained by selling equity in Hercules.  Defendant also falsely represented that the sale of equity in Hercules was intended to finance the expansion of Hercules's infrastructure and staff.  In truth, defendant intended to use the funds to repay Hercules's clients and fund his own lifestyle.  In total, victim investors in Hercules, who invested collectively through victim T.I., invested $675,000.  Defendant repaid only approximately $106,455 of T.I.'s $675,000 investment, resulting in a total loss of $566,044.37 to the Hercules victims.

Defendant also defrauded his ISA clients.  Defendant falsely represented to ISA clients that he would use their money to trade securities.  In reality, he used less than half of the approximately $3.6 million he raised from ISA clients for trading purposes and conducted no trading at all with ISA client money from October 2020 to May 2021.  Instead, defendant frequently commingled ISA client funds with funds from his personal bank account, which itself had

been commingled with ISA funds and funds from Hercules clients. Using approximately $1.4 million of the commingled funds, defendant made Ponzi-like payments to ISA clients -- that is, paying ISA clients using funds from other clients. Defendant also used approximately $1 million of ISA money to purchase luxury cars and to pay rent on his home, personal credit card charges, and Hercules operating expenses. In total, victim investors in ISA invested $3,284,600.00. Defendant repaid only approximately $596,722.24, resulting in a total loss of $2,687,877.76 to the ISA victims.

As part of defendant's plea agreement, he agreed to pay "full restitution" to the victims of the offense to which he was pleading guilty. (Dkt. 29 at 5.) For the reasons outlined below, defendant should be ordered to pay full restitution to the victims of his fraudulent schemes in the amount of $3,253,922.13.

## II. ARGUMENT

### A. Legal Standard

Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(a)(1), requires that "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense." In addition, "[t]he court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." 18 U.S.C. § 3663A(a)(3).

### B. No Procedural Bar Limits the Restitution To Which Defendant's Victims Are Entitled

Defendant argues in his sentencing position that restitution should be limited to the four victims whose victim impact statements

2

were listed in the original PSR, citing 18 U.S.C. § 3664's admonition that the government provide a list of the amounts subject to restitution to the Probation Officer 60 days before sentencing. (Dkts. 33 at ¶¶ 27-33, 45 at 35.)  Defendant's argument fails for multiple reasons.

First, 18 U.S.C. § 3664 does not confer rights on a defendant. The Ninth Circuit, consistent with the Second, Fourth, Sixth and Seventh Circuits, has held that "because the procedural requirements of section 3664 were designed to protect victims, not defendants, the failure to comply with them is harmless error absent actual prejudice to the defendant." United States v. Cienfuegos, 462 F.3d 1160, 1163 (9th Cir. 2006).  Defendant points to no actual prejudice, nor could he.  The original PSR filed on June 23, 2025, noted the government's position that the "final restitution amount has not been determined and would not be available prior to the disclosure of" the original PSR.  (Dkt. 33 at ¶ 28.)  The original PSR then expressly stated that its calculation was based only on the four victim impact statements that "ha[d] been received by [the government] as of the date of th[e] report."  Id.  The government then filed its sentencing position on July 21, 2025 (thirteen days before sentencing), which attached a declaration from IRS Special Agent Ryan Asato and set forth the total amount of restitution as $3,255,072.13, and the total victim losses yielding that restitution amount.  (Dkt. 37-2 at ¶¶ 7-9.)  Defendant filed his public sentencing position on July 23, 2025, which included six pages responding to the government's restitution list, including the additional victims listed in the government's July 21, 2025 sentencing position.  (Dkt. 45 at 34-39.)  The revised PSR issued on July 29, 2025 then included the full victim calculation included in

3

the government's sentencing position and agreed that restitution should be owed in the total amount of $3,255,072.13. (Dkt. 55 at ¶ 134.) Now, the Court has set a restitution briefing schedule to allow defendant to respond again to the full restitution list on October 6, 2025, and has set a restitution hearing for October 20, 2025. (Dkt. 68.) Defendant has been given a full opportunity to respond to the full restitution list and cannot possibly claim any actual prejudice from any § 3664 violation.

Second, § 3664 contemplates situations like this one in which not all victim losses had been calculated in advance of the presentence investigation. Section 3664(d)(1) states that the government shall provide the probation officer with a listing of the amounts subject to restitution 60 days prior to the date initially set for sentencing after consulting with all identified victims "to the extent practicable." Section 3664(d)(5) then sets forth the procedures to follow if additional losses are discovered or if the victim's losses are not ascertainable ten days prior to sentencing:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

The remedy is not to deprive the victims of their right restitution. Here, the government had not received all victim impact statements 60 days prior to sentencing, but the full list of ascertainable victim losses was included in the government's sentencing position filed thirteen days before sentencing. The Court has now set a restitution hearing consistent with the strictures of § 3664.

4

Finally, defendant's procedural argument runs counter to the MVRA's mandate that he shall make restitution to the victims of his crimes "[n]otwithstanding any other provision of law." 18 U.S.C. § 3663(A)(a)(1). Section 3664 is not a loophole through these rights. To hold contrary would have absurd policy consequences. Section 3664(d)(1) directs the government to submit its restitution list to the probation officer 60 days prior to the date "initially set" for sentencing, even if that date is later continued. If this subsection posed a bar to further victim recovery, then defendants could avoid paying full restitution where restitution calculations are complicated by rushing their guilty pleas, and the government's incentive would be to withhold plea offers in such situations. Such a result is good for neither victims nor the speedy resolution of cases, and it is not the law.

**C.   The Court Should Award $3,253,922.13 in Restitution**

As to the four victims outlined in the original PSR, defendant does not challenge the victim status or the $566,044.37 loss amount incurred by T.I., the pooled investment vehicle that collectively represents the loss of the Hercules victims. (Dkt. 45 at 38.) Defendant also does not challenge the victim status or the loss amount incurred by ISA victims V.S., J.M., A.C., B.C., or Z.Z. In total, these victims incurred a loss of $1,438,130.24. (Dkt. 45 at 38.)

As to the remaining victims outlined in the revised PSR, who are all ISA victims, defendant challenges the victim status of the remaining ISA victims and challenges the loss amount for ISA victims R.S. and V.G. and E.G.

A summary of defendant's challenges is set forth below:

5

| Investor Type | Investor Name | Government's Loss Calculation | Defendant's Restitution Challenges |
|---|---|---|---|
| Hercules | T.I. | $566,044.37 | Undisputed |
| ISA | V.S. | $29,900.00 | Undisputed |
| | J.M. | $325,000.00 | Undisputed |
| | A.C. | $402,435.25 | Undisputed |
| | B.C. | $280,795.00 | Undisputed |
| | Z.Z. | $400,000.00 | Undisputed |
| | C.M. | $280,000.00 | Victim Status Undisputed; Loss Amount Disputed ($210,000.00) |
| | A.F. | $195,600.00 | Victim Status Disputed; Loss Amount Undisputed |
| | D.P. | $127,500.00 | Victim Status Disputed; Loss Amount Undisputed |
| | E.F. | $59,570.00 | Victim Status Disputed; Loss Amount Undisputed |
| | S.W. | $98,827.51 | Victim Status Disputed; Loss Amount Undisputed |
| | R.S. | $309,400.00 | Victim Status Disputed; Loss Amount Disputed ($60,000.00) |
| | V.G. and E.G. | $178,850.00 | Victim Status Disputed; Loss Amount Disputed ($0) |

1. <u>Defendant's Challenges to the Victim Status of the Remaining ISA Victims Overlooks the Nature of Defendant's Fraud Scheme</u>

Defendant challenges the victim status of ISA victims A.F., D.P., E.F., S.W., R.S., and V.G. and E.G. on the ground that they did not submit individual victim impact statement claiming they were defrauded and otherwise did not receive any false statements, including false monthly ISA statements. (Dkt. 45 at 37, n.24.) But no reasonable investor would have entrusted her savings to defendant had she known the truth: that defendant commingled ISA client funds in an ordinary bank account he controlled, spent much of it funding his personal lifestyle, and traded only a minimal portion without delineating whose funds were involved in those trades. Such material

6

omissions are themselves enough to predicate restitution in a fraud prosecution when the defendant, as here, held a fiduciary duty. See United States v. Laurienti, 611 F.3d 530, 540 (9th Cir. 2010).

As outlined in Special Agent Asato's Supplemental Declaration, R.S., as well as E.G. have explained that defendant never revealed to them how he was truly treating the ISA victim funds. R.S. and E.G. both stated that they understood that defendant would invest or trade the entirety of the money they invested with defendant. Both said they were not aware that ISA was ever not registered as an investment adviser, that defendant traded less than half of the total money that he raised for all ISA clients, that he mixed the funds he raised from ISA clients with his own money in common bank accounts, or that he would use a portion of ISA client funds for his own personal expenses. Defendant admitted to each of these things in his plea agreement. (Dkt. 29 at ¶ 10.) Both R.S. and E.G. said that these facts would have been important to them. And both R.S. and E.G. lost money they believed they were investing with defendant. That same reasoning applies to all the ISA victims.[1]

### 2. Defendant Does Not Challenge the Loss Amount of the Majority of ISA Victims

As outlined in defendant's sentencing position (Dkt. 45 at 38), defendant does not challenge the loss amount attributable to the ISA victims, except the three victims outlined below. Thus, if the Court finds that R.S., V.G and E.G., A.F., D.P., E.F., and S.W. are ISA

---

[1] Defendant's plea agreement also contemplates that the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty. (Dkt. 29 at ¶ 6.)

7

victims for the reasons outlined above, defendant agrees to a loss amount of $1,919,627.76:

| Investor Type | Investor Name | Government's Loss Calculation | Defendant's Restitution Challenges |
|---|---|---|---|
| ISA | V.S. | $29,900.00 | Undisputed |
| | J.M. | $325,000.00 | Undisputed |
| | A.C. | $402,435.24 | Undisputed |
| | B.C. | $280,795.00 | Undisputed |
| | Z.Z. | $400,000.00 | Undisputed |
| | A.F. | $195,600.00 | Victim Status Disputed; Loss Amount Undisputed |
| | D.P. | $127,500.00 | Victim Status Disputed; Loss Amount Undisputed |
| | E.F. | $59,570.00 | Victim Status Disputed; Loss Amount Undisputed |
| | S.W. | $98,827.51 | Victim Status Disputed; Loss Amount Undisputed |
| | **TOTAL** | $1,919,627.76 | |

3. <u>Defendant's Limited Challenges to the Remaining ISA Victims are Incorrect</u>

Defendant challenges the loss amounts for ISA victims C.M., R.S., and V.G. and E.G.:

| Investor Type | Investor Name | Government's Loss Calculation | Defendant's Restitution Challenges |
|---|---|---|---|
| | C.M. | $280,000.00 | Victim Status Undisputed; Loss Amount Disputed ($210,000.00) |
| | R.S. | $309,400.00 | Victim Status Disputed; Loss Amount Disputed ($60,000.00) |
| | V.G. and E.G. | $178,850.00 | Victim Status Disputed; Loss Amount Disputed ($0) |

Regarding ISA victim C.M., defendant believes that because he provided his car to C.M., that C.M.'s loss should be offset by $70,000 for the value of that car. (Dkt. 45 at 34.) But, as the government explained in its sentencing position, C.M. was also defendant's car mechanic and obtained a car from defendant as a mechanic's lien for unpaid vehicle servicing. (Dkt. 37 at 18.)

8

Because that debt is separate and apart from defendant's fraud scheme, it is not a basis for reducing defendant's restitution obligation to C.M.  Defendant raised this objection previously, and the Probation Office appropriately rejected it as unsupported by evidence.  (Dkt. 56, at 4-5.)

Regarding ISA victim R.S., defendant believes that R.S.'s loss is limited to $60,000.  But defendant overlooks that R.S. made two additional transfers to defendant on April 25, 2019 for $49,400 and on March 23, 2020 for $200,000.  The government has spoken with R.S., who confirmed that he made those transfers to defendant and that he initiated those transfers in person at the bank.  Defendant's bank records confirm that he received those transfers with a note of "CA TLR Transfer," which signals that the transfers were completed from inside the transferring bank, corroborating R.S.'s memory of his transfers to defendant.  In total, R.S. thus transferred at least $309,400.00 to defendant and confirmed that he loss that full amount to defendant.[2]

Finally, as to ISA victims V.G. and E.G., defendant believes that these two victims lost nothing.  But defendant overlooks that V.G. and E.G. made two check deposits to the defendant, which are listed on defendant's bank account as a "Counter Credit."  The government has spoken with E.G., who confirmed that V.G. transferred $230,000.00 to defendant by check to invest in ISA.  Bank records

---

[2] R.S. believed that he may have transferred more money to defendant, but has confirmed that the amount is at least $309,400.00.

show that E.G. and V.G. received a $50,000.00 payment, as well as a Zelle payment for $1,150.00,[3] resulting in a net loss of $178,850.00.[4]

### D.   The Interpleader Action

Consistent with conversations with defense counsel, it is the government's understanding that no funds have yet been disbursed in connection with the interpleader action in state court.  Thus, the restitution order should not be reduced to account for these funds at this point.  Of course, once restitution has been ordered, any recovery defendant's victims receive from the interpleader action should be credited against the outstanding figure, as would be the case with any post-judgment restitution payment.

## III. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court order restitution in the amount of $3,253,922.13.

---

[3] This $1,150 Zelle payment was not included in the restitution calculation in the revised PSR.  The restitution amount has accordingly been reduced from $3,255,072.13 in the revised PSR to $3,253,922.13.

[4] E.G. believed that defendant paid V.G. and E.G. $15,000.00, and that their net loss was $215,000.00.